UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WALTER WHITE,

      Plaintiff,

v.

CITY OF SOUTHFIELD and KEITH
LOUDEN,

      Defendants.

Case No. 14-cv-10557
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING IN PART AND GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [20]**

---

Southfield Police Sergeant Keith Louden approached Walter White in a Meijer Parking lot on suspicion that White was parked in a handicapped spot without a permit. Within minutes Louden had used his taser on White twice. The parties dispute how and why that happened. White maintains that Louden tased him without warning after he walked away from Louden following a brief discussion about his parking spot. So White sued, asserting various claims, including an excessive force claim under 42 U.S.C. § 1983 against Louden, a *Monell* claim against the City of Southfield, and claims of assault and battery and gross negligence against Louden under Michigan law. Defendants say that White actively resisted Louden, so it was reasonable to tase him. Defendants also argue that White's guilty plea to resisting and obstructing officers during the same incident bars him from suing now.

Before the Court is Defendants' motion for summary judgment on all of White's claims. (Dkt. 20, Def.'s Mot. Summ. J.) After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motion. *See* E.D. Mich. LR 7.1(f)(2). The Court finds that White has raised a genuine issue of material fact as

to whether Louden used excessive or unreasonable force when he tased White. Therefore, White's claims of excessive force (Count I) and assault and battery (Count II) survive summary judgment. However, Louden is entitled to summary judgment as to White's gross negligence claim (Count III), and White has waived his claim against the City of Southfield (Count IV).

## I.

On summary judgment, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party, here White. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A.

Lecara McClendon, Walter White's girlfriend, drove him to a Southfield, Michigan Meijer store on the evening of February 17, 2012. (Dkt. 30, Pl.'s Resp. Ex. A, White Dep. at 49–50; Pl.'s Resp. Exhibit D, McClendon Dep. at 19.) She parked her car in a handicapped spot and went inside the store. (White Dep. at 50.) White stayed behind. He sat alone in the car's passenger seat with the engine running while he smoked marijuana. (*Id*. at 50–51.)

After about five to ten minutes, City of Southfield Sergeant Keith Louden approached in his patrol car. (*Id*. at 51.) According to White, after he saw Louden pull behind him, White stepped out of the car through the passenger door. (*Id*. at 54.) However, Louden says that White was in the driver's side and started to back the car up after he approached, so Louden parked his car behind White's car to stop him. (Def.'s Mot. Exhibit 2, Louden Dep. at 49–50.)

White and Louden then exchanged some words about White's parking predicament. In White's version of events, he simply tried to explain to Louden that he wanted to have his girlfriend move the car from the handicap spot, as he did not have a license. (White Dep. 31, 57.) More specifically, after White got out of the car, he first walked around to the driver's side. (*Id*.

2

at 54.) Louden then asked, "What are you doing?" (*Id*. at 55.) White responded, "I'm about to move the car." (*Id*. at 55.) Louden told White not to move the car and asked whether he had a "permit." (*Id*. at 55.) Louden also asked if White was moving the car just because he saw an officer. (*Id*. at 57.) White told Louden that he was going to get the car's owner. (*Id*. at 57.) In Louden's version, he simply asked some questions about the offense he suspected at the time— parking in a handicapped spot without a permit is indeed a civil infraction that carries a fine. (*See* Louden Dep. at 49.) Louden says he asked for White's driver's license and "vehicle paperwork," and White replied that he did not have his "paperwork." (Louden Dep. at 51.) Louden also says he noticed the smell of marijuana, and after he inquired, White told him someone had smoked in the car earlier. (*Id*. at 51–52.)

Regardless of what exactly was said, the incident quickly escalated. White testified that after the initial encounter next to the car, he walked away from Louden, who then chased him down and tased him without warning or reason. Specifically, White "notice[d] the attitude" from Louden, so White "proceeded to walk off." (White Dep. at 55–56.) As White walked away from his car, Louden got "[his] attention again" by saying "stop, freeze, or something like that." (*Id.* at 58–59.) After White turned around, Louden asked again what White was doing and told him not to go anywhere. (*Id*. at 59.) White then asked whether he was under arrest, but the officer did not answer, so White turned back around. (*Id.*) Louden then ran up to White, and White again asked whether he was under arrest. (*Id.*) Louden then shot him with a taser without warning. (*Id.*)

Cierra Washington, an eyewitness, testified to a similar account. She says that she saw White get out of the passenger side of his car and talk to the officer. (Pl.'s Resp. Ex. C, Washington Dep. at 26–27.) According to Washington, after White and Louden initially spoke, White walked away "fast" "directly towards Meijer" but was not running. (*Id*. at 32.) She says

that Louden then told White to stop, but he kept walking, eventually stopping once he reached the door to Meijer. (*Id.* at 35–36.) The two then "had words going back and forth." (*Id.* at 37.) She says White had his hands up and then, "I just heard [White] say, like, was he under arrest, and that's when he—that's when he got tased." (*Id*. at 39, 64.)

Louden tells a different story. He testified that White did not just walk away after they exchanged words. Rather, Louden says that the initial exchange became physical, White fled, and in response, Louden chased him and tased him only after White balled his fists at him. In particular, Louden testified, "I told [White] to turn around and put his hands behind his back and I grabbed him by his arm. He pulled his arm away from me and told me don't touch him. I told him to turn around again and I physically turned him around and I started to secure his arms and he pulled away from me knocking my flashlight out of my hand and he took off running." (Louden Dep. at 57.) Still, Louden says that White did not physically or verbally threaten him at that time. (*Id*. at 63–64.) And Louden acknowledges that he never told White that he was under arrest. (*Id*. at 69.) Louden says he caught up to White near the front doors of the store. (*Id*. at 68.) He says he ordered White to stop and get on the ground, but White "spun around and squared up on [him] and faced [him]." (*Id.* at 69.) Louden says White's hands "started to come up and he had his fists balled," but Louden "didn't give him an opportunity" to hit him—Louden tased White in the mid-section, causing White to fall to the ground. (*Id*. at 70–72.)

The parties agree that Louden tased White a second time, but they again dispute the circumstances. White says that after Louden tased him, White fell down, tried to get back up, and tried to ask the officer questions. (White Dep. at 62.) In particular, White asked Louden what he was doing, but Louden just tased him again. (*Id.*) Louden agrees that after he first tased White, White fell. (Louden Dep. at 72.) But Louden says he told White to turn over, and White did not

4

comply. (*Id.*) He also says White tried to get up, and he did not put his hands behind his back, so Louden tased him again. (*Id.* at 73.) In all, the two tasings happened about five or ten seconds apart. (White Dep. at 94.) Both times, the taser hit White in the stomach. (*Id*. at 91.)

By all accounts, the scene calmed down after the second tasing. Afterward, Louden told White to lay down, and then he handcuffed him. (*Id*. at 68–69.) While down, White tried to get the attention of someone to go inside and get his girlfriend. (*Id.* at 66.) Washington complied. (*Id.*; Washington Dep. at 22, 40.) Another officer then pulled up and put White in a car. (White Dep. at 69.) White's girlfriend, McClendon, then came out of Meijer with Washington. (White Dep. at 69, 73.) White told McClendon, "don't say shit." (*Id.* at 70.) White also told Louden something to the effect that he would not press charges if the officer let him go. (*Id*. at 71; Louden Dep. at 77.)

It is undisputed that Louden never warned White that he would tase him. (White Dep. at 91; Louden Dep. at 74; Washington Dep. at 64.) White further adds that Louden never told him to turn around and put his hands up until after he tased him. (White Dep. at 65.) White also says that he never tried to run, pull the car away, get in any fighter stance, ball his fists, or otherwise threaten the officer. (*Id*. at 92.) As a result of the incident, White says he suffered back and elbow injuries and headaches from hitting his head when he fell. (White Dep. at 90–91, 94.)

**B.**

Close to a year after the incident, on January 15, 2013, White pled guilty to driving without a valid license and resisting and obstructing a police officer. (Pl.'s Resp. Ex. B, Plea Hearing Transcript at 4.) In his plea hearing, White acknowledged that he drove a car without a valid license. (*Id.* at 5.) He also answered "yes" when the court asked whether officers "tried to

5

arrest you and you . . . pulled away from one of the officers and refused to put your hands behind your back." (*Id.* at 6.)

## C.

On February 6, 2014, White filed a four-count complaint in this Court. Count I asserts that White is entitled to damages under 42 U.S.C. § 1983 because Louden violated the Fourth Amendment by using excessive force. (Dkt. 1, Compl. ¶¶ 23–26.) Count II asserts that Louden's force amounted to assault and battery under Michigan law. (*Id.* at ¶¶ 27–33.) Count III asserts that Louden's conduct constituted gross negligence under Michigan law. (*Id.* at ¶¶ 34–42.) And Count IV asserts a § 1983 damages claim against the City of Southfield because it "permitted customs, practices and/or policies which resulted in . . . violations of [White's] constitutional rights." (*Id.* at ¶ 45.)

Louden and Southfield moved for summary judgment on all counts on February 6, 2015. (Dkt. 20, Def.'s Mot.) In his response, White stated that "[b]ased upon discovery . . . the claims as to Defendant City of Southfield are no longer being pursued." (Dkt. 30, Pl.'s Resp. at 29.)

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a

jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

### III.

Louden first seeks to collaterally estop White from disputing that he "resisted arrest" by "pulling away from Sergeant Louden" and "refusing to place his hands behind his back." (Def.'s Mot. at 10.) Louden bases his argument on the following statements from White's plea hearing, where he pled guilty to a violation of a Southfield ordinance making it a misdemeanor to, among other things, resist an officer:

> The Court: Okay. And at some point [the officers] tried to arrest you and you – you pulled away from one of the officers and refused to put your hands behind your back correct?

> Mr. White: Yes.

(Def.'s Mot. Ex 4 at 6.) In his deposition, White denied recalling that he answered yes to the court's question. (White Dep. at 89.) He also said that a "yes" answer would have been a lie. (*Id.* at 90.)

To assess whether a state court's judgment collaterally estops a plaintiff from contesting a fact in a subsequent § 1983 action, federal courts must apply the state's collateral estoppel rules. *Haring v. Prosise*, 462 U.S. 306, 314 (1983). Michigan courts apply collateral estoppel when "(1) a question of fact essential to the judgment . . . [was] actually litigated and determined by a valid and final judgment; (2) the same parties . . . had a full [and fair] opportunity to litigate the issue; and (3) there [is] mutuality of estoppel." *Monat v. State Farm Ins. Co.*, 677 N.W.2d

843, 845–46 (Mich. 2004) (citation and internal quotation marks omitted). Mutuality of estoppel is not required for defensive uses of collateral estoppel such as Louden's. *See id*. at 850.

Two decisions from Michigan courts strongly suggest that under Michigan law facts admitted in guilty plea hearings are not "actually litigated" and thus do not meet the first element required for collateral estoppel. In *Lichon v. Am. Universal Ins. Co.*, 459 N.W.2d 288, 298–99 (Mich. 1990), the Michigan Supreme Court held that a plea of nolo contendere "cannot be considered 'actual litigation,' at least not in terms of collateral estoppel jurisprudence." *Id.* at 298–99. The court noted that it made "no ruling as to the preclusive effect of a conviction based upon a guilty plea." *Id.* at 299. But the court based its holding in part on a comment to the Restatement of Judgments, 2d, § 85, which provides that neither nolo contendere pleas nor guilty pleas meet the "actual litigation" element. *Id.* The *Lichon* court also quoted *People v. Taylor*, 195 N.W.2d 856, 865 (Mich. 1972), where the court had noted that when a trial court determines the factual basis of a guilty plea, "[s]uch examination is not the equivalent of a legal trial." *Id.*

Though the Sixth Circuit has suggested that the Michigan Supreme Court might reconsider its holding in light of subsequent amendments to the Michigan Rules of Evidence, *see Neshewat v. Salem*, 173 F.3d 357, 362 n. 4 (6th Cir. 1999), it has not. In the meantime, in a case addressing judicial estoppel, the Michigan Court of Appeals has cited *Lichon* to state broadly that "[a] guilty plea conviction . . . does not amount to preclusive evidence of any fact in subsequent litigation." *Klein v. Shamrock Tavern, Inc.*, 2008 WL 2117609, at *4 (Mich. Ct. App. May 20, 2008).

Thus, while the law is not settled, it appears that a Michigan court might hold that White did not "actually litigate" the facts he admitted in his plea hearing, so collateral estoppel should not preclude him from contesting those facts now. The cases Louden cites in support of his

8

argument are not persuasive because none of them applied the principles of collateral estoppel as articulated by the Michigan courts. *See Walker*, 854 F.2d at 142 (no contest plea in Ohio state court estopped claim that officers acted without probable cause in § 1983 suit); *Sinclair v. City of Birmingham*, No. 04–70670, 2005 WL 2448864, at *4 (E.D. Mich. Oct. 3, 2005) (holding—without applying Michigan law—that guilty plea in Michigan court to charge of resisting arrest estopped plaintiff "from contesting the fact that he resisted and obstructed"); *Brady v. Stone*, No. 08–13463, 2010 WL 2870208, at *10 (E.D. Mich. Jul. 21, 2010) (holding—without applying Michigan law—that plaintiff was estopped from denying "active resistance" because he "resist[ed], obstruct[ed], and assault[ed] a police officer—an offense to which he [pled] guilty.")

Still, because White's positions in his plea hearing and his subsequent deposition are not entirely consistent, the Court recognizes that—even though Louden raises only the issue of collateral estoppel—these circumstances may be appropriate for the doctrine of judicial estoppel. *See New Hampshire v. Maine*, 749 U.S. 742, 749 (2001) ("judicial estoppel is an equitable doctrine invoked by a court at its discretion" (internal quotation marks and citation omitted)). "The doctrine of judicial estoppel prevents a party who successfully assumed one position in a prior legal proceeding from assuming a contrary position in a later proceeding." *Mirando v. U.S. Dep't of the Treasury*, 766 F.3d 540, 545 (6th Cir. 2014) (citing *New Hampshire*, 749 U.S. at 749). Three factors are useful to determine whether judicial estoppel applies:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, [we] regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Mirando*, 766 F.3d at 545 (quoting *New Hampshire*, 532 U.S. at 750–51).

9

Here, the actual facts to which White admitted in his plea are not "clearly inconsistent" with his account of the incident with Louden as described in White's deposition. White vaguely admitted in his plea hearing that "at some point" he "pulled away" from officers. (Def.'s Mot. Ex 4 at 6.) But at his deposition, White simply answered "no" to specific questions about whether he ever "pull[ed]" his "arm away from the officer at any time" or whether he ever "pull[ed] away from an officer such that he would drop his flashlight"—not whether he "pulled away" in any general sense "at some point." (*See* White Dep. at 92–93.) Similarly, White's deposition testimony was not clearly inconsistent with his plea admission that he "refused to put [his] hands behind [his] back." (*See* Def.'s Mot. Ex 4 at 6.) White acknowledged in his deposition that Louden told him to put his hands behind his back (he maintained this happened after Louden tased him), but he did not address whether he complied at that time. (White Dep. at 65.) Finally, in general, White acknowledged in his deposition that he was at least non-compliant to some degree. In particular, White testified that the officer "told me to stop" but that he "wasn't compliant" because the officer "never said I was under arrest." (White Dep. at 15.)

Though it appears that White's positions from his plea hearing and deposition are not "clearly inconsistent," the Court need not fully resolve this issue. Even if White is estopped from contesting that "at some point" Louden "tried to arrest [him] and [he] . . . pulled away . . . and refused to put [his] hands behind [his] back," as discussed below, that does not entitle Louden to summary judgment.[1] So, as White urges, to the extent his positions have been inconsistent, that goes to the weight and credibility of his evidence, which is not an issue for summary judgment. *See*, *e.g.*, *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010) ("In reaching this conclusion that Schreiber may go forward with his excessive-force claim, we acknowledge that Schreiber's

---

[1] Louden also argues that White should be estopped from contesting that he drove without a license the day of the incident. But that fact is immaterial to White's claims.

deposition testimony is at times inconsistent both with itself and with his prior statements. We emphasize, however, that in reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." (internal quotation marks and citation omitted)).

## IV.

The Court now addresses whether Louden is entitled to summary judgment on White's § 1983 claim.

## A.

Louden first argues—in a theme similar to his collateral estoppel argument—that *Heck v. Humphrey*, 512 U.S. 477 (1994), bars White's § 1983 claim because White pled guilty to a Southfield ordinance that makes it a misdemeanor to "obstruct, resist, [or] oppose" police officers "in their lawful acts, attempts and efforts to maintain, preserve and keep the peace." (*See* Def.'s Mot. Ex. 6.)

In *Heck*, the Supreme Court held that a plaintiff cannot assert a § 1983 claim that would "necessarily imply the invalidity" of an underlying criminal conviction. *Heck*, 512 U.S. at 487. The Court has since noted that in *Heck*, it "stress[ed] the importance of the term 'necessarily.'" *Nelson v. Campbell*, 541 U.S. 637, 647 (2004). "The mere fact that the conviction and the § 1983 claim arise from the same set of facts is irrelevant if the two are consistent with one another." *Schreiber v. Moe*, 596 F.3d 323, 334 (6th Cir. 2010). However, a § 1983 claim could conflict with a plaintiff's criminal conviction where (1) "the criminal provision makes the lack of excessive force an element of the crime" or (2) "excessive force is an affirmative defense to the crime." *Id.* at 334.

The Sixth Circuit's recent opinion in *Lucier v. City of Ecorse*, 601 F. App'x. 372 (6th Cir. 2015), suggests that *Heck* does not bar White's § 1983 claim. There, Lucier alleged that the

police used excessive force when they tased him at two different times—once in his basement and again after officers put him in a patrol car. *Id.* at 374–75. As Lucier had no memory of events, the officers provided the only account of events in the patrol car, saying they tased him only after he started kicking them. *Id.* at 375. As for the basement, Lucier's wife said that he "never resisted the officers" before they tased him. *Id.* at 374. But Lucier had also pled guilty to resisting arrest under an ordinance that included as an element "[u]sing or threatening to use physical force or violence" or "[u]sing any other means creating a substantial risk of causing physical injury." *Id.* at 377. The Court held that *Heck* did not bar Lucier's excessive force claim because the claim did "not necessarily contradict" his guilty plea. *Id.* Specifically, the Court reasoned: "The factual basis of Plaintiff's guilty plea was never specified. Therefore this Court, like the district court, cannot determine whether Plaintiff's plea was based on his behavior in the basement or on his subsequent behavior in the patrol car." *Id.*

Here, similar to Lucier's plea, the factual basis of White's guilty plea did not specify when he resisted. As discussed for purposes of collateral estoppel, at White's plea hearing, he admitted only that "*at some point* [the officers] tried to arrest [him] and [he] – [he] pulled away from one of the officers and refused to put [his] hands behind [his] back." (Def.'s Mot. Ex 4 at 6 (emphasis added).) It is possible that White "pulled away" and "refused" to put his hands behind his back after his initial discussion with Louden. But it is also possible that White pulled away or refused to put his hands behind his back only after Louden tased him. Thus, even if White resisted Louden's unspecified lawful acts "at some point," Louden could have used excessive force by tasing White at another point when White did not resist.

Thus, the Court is not persuaded by Louden's reliance on *Houston v. Buffa*, No. 06–10140, 2007 WL 1005715 (E.D. Mich. Mar. 30, 2007). (*See* Def.'s Mot. at 22–23.) In *Houston*,

after a night club confrontation with officers, Houston was tried and convicted under an ordinance that—like the one relevant here—made it unlawful to resist or obstruct officers in their "lawful" acts. *Id.* at *4. He then filed a § 1983 claim alleging false arrest and excessive force. *Id.* at *1. Houston's criminal trial and § 1983 case involved the same two competing stories. Houston claimed that upon entering the club, officers almost immediately executed a false arrest and then beat him. *Id.* at *1. The officers maintained that Houston initially agreed to speak with them when they approached him in the club, but as they began walking, Houston became physically aggressive, leading the officers to subdue him. *Id.* The court found that *Heck* barred Houston's § 1983 claims for excessive force and false arrest because his conviction necessarily implied that the jury rejected his version of events and accepted the officers'—including that the officers were carrying out their "lawful duties" and therefore did not execute a false arrest or engage in excessive force. *Id.* at *6.

Unlike in *Houston*, White's conviction for resisting or obstructing an officer did not necessarily adopt one of two competing versions of events. As noted, White admitted at his plea hearing only that he "pulled away" and refused to put his hands behind his back "at some point." (Def.'s Mot. Ex 4 at 6.) It is not clear at which point this happened, making it impossible to determine whether the plea was based on White's conduct before the tasings, during the first tasing, during the second tasing, between the two tasings, or afterward. *See Hadley v. Gutierrez*, 526 F.3d 1324, 1331 (11th Cir. 2008) (holding that a guilty plea for resisting arrest did not bar excessive force claim because "[t]he resisting arrest count to which Hadley pleaded guilty is general in nature, and offers no insight into the sequence of events surrounding Hadley's arrest, including at what point Hadley resisted. It is theoretically possible that Hadley was punched then resisted, or even that he resisted first, but was punched after he stopped resisting.").

13

In short, the ambiguity in the sequence of events precludes *Heck* from applying here because the Court cannot find conclusively that White's excessive force claim would *necessarily* invalidate his guilty plea.

## B.

Louden next argues that qualified immunity entitles him to summary judgment for White's § 1983 excessive force claim. (Def.'s Mot. 15–21.) Qualified immunity shields Louden from suit if he "reasonably believe[d] that his . . . conduct complie[d] with the law." *See Pearson v. Callahan*, 555 U.S. 223, 244 (2009). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 231.

To defeat a qualified immunity defense, "a plaintiff must establish (1) that the defendant violated a 'constitutional right' and (2) that the right 'was clearly established.'" *Leary v. Livingston Cty.*, 528 F.3d 438, 441 (6th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). District courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

The Court will first address the first prong. "The Fourth Amendment prohibits the use of excessive force during the seizure of a free citizen." *Monday v. Oullette*, 118 F.3d 1099, 1104 (6th Cir. 1997). When analyzing excessive force claims, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The "proper application" of the reasonableness test "requires careful attention to the facts

and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id* at 396.

Viewing the facts in the light most favorable to White, a reasonable jury could find that Louden's tasings were not objectively reasonable and thus amounted to excessive force in violation of the Fourth Amendment. All three of the *Graham* factors weigh against Louden. First, the crime at issue was far from severe. The altercation arose because Louden suspected White had parked in a handicapped spot without a permit. (Louden Dep. at 47.) Second, drawing all reasonable inferences in White's favor, he posed no immediate threat to Louden's safety at any time. Though Louden claims that White pulled his arm away and fled after their initial confrontation, even he concedes that White did not threaten him then. (*Id*. at 63–64.) And when Louden first tased White, though Louden says White "spun around" and "had his fists balled," White and Washington's testimony suggests otherwise. White says that he simply turned around and asked whether he was under arrest, and Washington adds that White had his "hands up." (White Dep. at 59; Washington Dep. at 64.)  On summary judgment, it is White's account the Court must accept. As to the second tasing, a reasonable jury could certainly find that a confused and shocked White posed no threat in the five to ten seconds between the two tasings. (White Dep. at 94.)

As for the final *Graham* factor—whether White actively resisted—the Sixth Circuit has made clear that "[w]hen a suspect actively resists arrest, the police can use a taser . . . to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." *See Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015) (holding it was reasonable to tase someone who was "verbally defiant," "puffed his chest and stared down" the officer, "twice swung his arms in the

officer's direction," and tried to stop the officer from handcuffing him). "Active resistance includes physically struggling with, threatening, or disobeying officers." *Id.* at 641 (internal quotation marks and citation omitted). Active resistance also includes "refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance." *Id.* at 641 (citing *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94, 96–97 (6th Cir. 2012)). Finally, active resistance includes fleeing. *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012) (holding that it was not a violation of a clearly established constitutional right to tase a "non-violent misdemeanant, fleeing from the scene of a non-violent misdemeanor [jaywalking]").

Drawing all reasonable inferences in White's favor, there is a genuine issue of material fact as to whether he actively resisted before either of the two tasings. For one, regardless of what actually happened during White's initial encounter with Louden and whether he "pulled" away from Louden, there is record support that White did not "flee." Both White and Washington testified that he *walked* away. (Washington Dep. at 32; White Dep. at 55–56.) Even Louden himself testified it would have been inappropriate to tase someone who merely walked away. (Louden Dep. at 40.) After White walked away, the record supports that he did not actively resist Louden. White says that he stopped, asked whether he was under arrest, and turned back around when Louden did not answer. (White Dep. at 59.) Then, once Louden "r[a]n up," White turned around again, at which point Louden tased him. (*Id.*) Thus, a jury could find that Louden first tased White when White had stopped, had his hands in the air, (*see* Washington Dep. at 64), and was not threatening Louden in any way. *See Rudlaff*, 791 F.3d at 641 ("[A]ctive resistance does not include . . . hav[ing] stopped resisting[.]"); *see also Kijowski v. City of Niles*, 372 F. App'x 595, 600 (6th Cir. 2010) ("[A]bsent some compelling justification—such as the

16

potential escape of a dangerous criminal or the threat of immediate harm—the use of [a stun gun] on a non-resistant person is unreasonable[.]").

Only five to ten seconds passed before Louden tased White again. (White Dep. at 94.) White says that after the first tasing he "tr[ied] to get back up" and tried to ask why Louden tased him. (White Dep. at 64.) But even if—as Louden claims—White was not complying during that small window of time, he "was likely not resisting arrest between taser deployments because there simply was no time between tasings for [White] to comply with . . . directions." *See Brown v. Weber*, 555 F. App'x 550, 554–55 (6th Cir. 2014) (internal quotation marks and citations omitted). Furthermore, it is undisputed that Louden never warned White that he would tase him. (White Dep. at 91; Louden Dep. at 74; Washington Dep. at 64.)  And, as the Sixth Circuit has noted, "The tasing of a suspect without warning is, at the very least, an additional factor useful in determining whether an officer violated a suspect's Fourth Amendment right to be free of excessive force." *Baker v. Union Twp.*, 587 F. App'x 229, 236 (6th Cir. 2014).

In Louden's view, he is entitled to qualified immunity because his own version of the facts demonstrates White's active resistance. For the first tasing, Louden argues that "[t]he evidence reveals that Sergeant Louden activated his taser when White pulled away from Sergeant Louden, fled toward the entrance to Meijer, and ignored Sergeant Louden's commands to stop." (Def.'s Mot. at 17.) Similarly, for the second tasing, Louden argues that he is entitled to qualified immunity because "[t]he evidence reveals that [he] activated his taser when White refused to turn over and place his hands behind his back as Sergeant Louden attempted to secure him in handcuffs." (Def.'s Mot. at 21.) But "[i]n assessing . . . immunity at the summary judgment phase of the case," the Court must give White, not Louden, "the benefit of all reasonable factual inferences from the record, asking only whether the officers are entitled to

17

judgment as a matter of law." *See Krause v. Jones*, 765 F.3d 675, 679 (6th Cir. 2014). And where, as here, the question of qualified immunity "'is completely dependent upon which view of the facts is accepted by the jury,' the 'jury becomes the final arbiter of a claim of immunity.'" *Bouggess v. Mattingly*, 482 F.3d 886, 888 (6th Cir. 2007) (quoting *Brandenburg v. Cureton*, 882 F.2d 211, 215–16 (6th Cir. 1989)).

Accordingly, a reasonable jury could find that Louden used excessive force because he tased White at time when White was not resisting or was no longer resisting. White's right to be free from such force was clearly established at the time, in February 2012. *See, e.g.*, *Eldridge v. City of Warren*, 533 F. App'x. 529, 535 (6th Cir. 2013) ("[T]he two officers' actions violated a clearly-established right: the right of a suspect to be free from the use of physical force when he is not resisting police efforts to apprehend him. . . . Our decision in *Hagans* clarified that this particular right was 'clearly established' before and after May 2007—and more importantly for our purposes, before June 2009."). Louden is therefore not entitled to qualified immunity as a matter of law.

\* \* \*

In sum, the Court finds that Louden is not entitled to summary judgment on White's excessive force claim. *Heck* does not bar the claim, and genuine issues of material fact preclude a finding of qualified immunity.

## V.

Remaining are White's claims of assault and battery and gross negligence under Michigan law, which are based on the same facts giving rise to his excessive force claim.

**A.**

Generally, an assault requires a plaintiff to show "any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *Espinoza v. Thomas*, 472 N.W.2d 16, 21 (Mich. Ct. App. 1991). For battery, a plaintiff must generally demonstrate "wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact." *Id.*

Special considerations apply in an assault and battery claim against a police officer. "It is well-settled in [Michigan's] jurisprudence that a police officer may use reasonable force when making an arrest." *VanVorous v. Burmeister*, 687 N.W.2d 132, 141 (Mich. Ct. App. 2004) (internal quotation marks and citation omitted), *overruled in part on other grounds by Odom v. Wayne Co.*, 760 N.W.2d 217 (Mich. 2008). "The force reasonably necessary to make an arrest is the measure of necessary force that an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary." *Id.* (internal quotation marks and citation omitted). Therefore, White's assault and battery claim is "analogous to [his] § 1983 excessive force claim, in that [he] can only recover if [Louden's] conduct was objectively unreasonable." *Bell v. Porter*, 739 F. Supp. 2d 1005, 1015 (W.D. Mich. 2010) (citing *VanVorous*, 687 N.W.2d at 142). But as discussed regarding White's excessive force claim, a reasonable jury could find that Louden's force was objectively unreasonable. Thus, the "same issues of fact identified with respect to Plaintiff's excessive force claim preclude entry of summary judgment on Plaintiff's assault and battery claim." *Id.*

Still, Louden argues that he is not liable for these actions because of governmental immunity. (Def.'s Mot. at 24–25.) "Governmental actions which would normally constitute intentional torts are protected by governmental immunity if those actions are justified. Conversely, if the actions are not justified, they are not protected by governmental immunity." *Brewer v. Perrin*, 349 N.W.2d 198, 202 (Mich. Ct. App. 1984). To be entitled to governmental immunity, Louden must "establish that he was acting in the course of his employment and at least reasonably believed that he was acting within the scope of his authority, that his actions were discretionary in nature, and that he acted in good faith." *Miller v. Sanilac Cty.*, 606 F.3d 240, 254 (6th Cir. 2010) (citing *Odom v. Wayne Cty.*, 760 N.W.2d 217, 228 (Mich. 2008)). Good faith is defined as "without malice." *See Odom*, 760 N.W.2d at 225.

"The question of an officer's good faith under Michigan law overlaps considerably, if not entirely, with [the] analysis of whether the officer's actions were objectively reasonable under the circumstances." *Malory v. Whiting*, 489 F. App'x 78, 86 (6th Cir. 2012). However, "Michigan state law imposes a subjective test for governmental immunity for intentional torts, based on the officials' state of mind, in contrast to the objective test for federal qualified immunity." *Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015). For the same reasons discussed above in the Court's excessive-force analysis, White has raised a genuine issue of material fact as to whether Louden acted with malicious intent. A reasonable jury could find that Louden's use of a taser "was intended to harm [White] . . . [or] show[ed] such indifference to whether harm [would] result as to be equal to a willingness that harm [would] result." *See id.* Thus, summary judgment is inappropriate for White's assault and battery claim.

**B.**

Summary judgment is, however, appropriate for White's gross negligence claim. Michigan law "reject[s] attempts to transform claims involving elements of intentional torts into claims of gross negligence." *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004) (citing cases). Therefore, "if a claim of gross negligence is premised on [an] alleged assault of plaintiff," summary disposition of the gross negligence claim is appropriate. *Norris v. Police Officers*, 808 N.W.2d 578, 584 (Mich. Ct. App. 2011). When faced with claims of gross negligence, courts are to determine the "gravamen" of the action by "examining the entire claim." *Norris*, 808 N.W.2d at 584; *see also Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011) ("[P]laintiff claims that defendants' alleged use of excessive force constituted gross negligence . . . . The only cause of action available to plaintiff for allegations of this nature would be for assault and battery."); *Livermore v. Lubelan*, 476 F.3d 397, 408 (6th Cir. 2007) ("Although her complaint is articulated in terms appropriate for a negligence claim (e.g., 'failing to understand'), Livermore's gross negligence claim against Sgt. Lubelan is undoubtedly premised on the intentional tort of battery.").

The "gravamen" of White's gross negligence count is battery. The only duty he says Louden breached is the duty to perform his employment activities "so as not to endanger or cause harm to Plaintiff." (Compl. ¶ 37.) He argues that Louden breached this duty because his "unlawful acts clearly evidenced a substantial lack of concern for whether an injury resulted to Plaintiff." (Pl.'s Resp. at 28.) He also argues that Louden's "over-reaction" and "general treatment and demeanor" rose to gross negligence. (*Id.*) But White fails to explain how this claim is based on anything other than the same intentional conduct that gave rise to his assault and battery claim. Accordingly, the Court will dispose of this claim as a matter of law.

21

**VI.**

White has raised a genuine issue of material fact as to whether Louden's use of a taser was excessive force. But he has not raised a genuine issue of material fact concerning whether Louden's conduct amounted to gross negligence. Additionally, White has waived his *Monell* claim against the City of Southfield.

Accordingly, Louden's Motion for Summary Judgment (Dkt. 20) is DENIED as to Counts I and II and GRANTED as to Counts III and IV.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  September 18, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 18, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson

22